**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JOHN R. PICKREIGN,

                     Plaintiff,

v.

LARRY S. BULMAN, as Trustee of the United Association of Plumbers Local 773 Pension Plan; EDWARD J. FURR, as Trustee of the United Association of Plumbers Local 773 Pension Plan; JOHN A. LaPLANTE, JR., as Trustee of the United Association of Plumbers Local 773 Pension Plan; DANIEL R. MONROE, as Trustee of the United Association of Plumbers Local 773 Pension Plan; TERRY BULMAN, as Trustee of the United Association of Plumbers Local 773 Pension Plan; and THE UNITED ASSOCIATION OF PLUMBERS LOCAL 773 PENSION PLAN,

                     Defendants.

No. 05-CV-1120
(DRH)

---

**APPEARANCES:**

MICHAEL T. BROCKBANK, ESQ.
Attorney for Plaintiff
1494 Wendell Avenue
Schenectady, New York 12308

POZEFSKY, BRAMLEY & MURPHY
Attorney for Defendants
90 State Street
Albany, New York 12207

**OF COUNSEL:**

WILLIAM P. POZEFSKY, ESQ.

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

Plaintiff John R. Pickreign ("Pickreign") commenced this action[1] seeking a judgment

---

[1] The action was commenced on January 21, 2005 in the New York State Supreme Court, Warren County and removed to this Court by defendants with Pickreign's consent.

against defendants The United Association of Plumbers Local 773 Pension Plan and its five trustees (collectively referred to herein as the "Trustees") (1) declaring that Pickreign is entitled to a pension and (2) awarding Pickreign benefits from November 17, 1998 to the date of judgment. Compl. (Docket No. 1, Ex. B) at p. 4. A non-jury trial was held on May 22, 2008. In accordance with Fed. R. Civ. P. 52, what follows constitutes the Court's findings of fact and conclusions of law. Based on those findings and conclusions, judgment is granted to the Trustees.

## I. Background

Pickreign was born on November 17, 1936. Ex. D-37.[2] From 1963 to May 31, 1975, Pickreign was employed full-time as a plumber by Fobare & Sons, a plumbing contractor in Saranac Lake, located in northeastern New York State. During the entire period of his employment at Fobare & Sons, Pickreign was a member of Local 497 of the United Association of Plumbers in Plattsburgh, New York. Pickreign terminated his employment at Fobare & Sons to start his own plumbing contracting business and never again worked as a union plumber.

Pursuant to a collective bargaining agreement between Local 497 and participating contractors, a pension plan for union employees was established in 1960. Ex. 1 at 1. The agreement required employers to contribute to the pension plan on behalf of qualifying

---

Notice of Removal (Docket No. 1). Removal was predicated on the Employees Retirement Income Security Act (ERISA), 28 U.S.C. § 1001 et seq. and 28 U.S.C. §§ 1441 and 1446. Id. at ¶¶6, 7.

[2]"Ex." followed by a letter and number refers to an exhibit received in evidence at trial.

union members, such as Pickreign. Id. On December 31, 1975, Local 497 merged its pension plan with that of Local 773 located in Glens Falls, New York to form the pension plan at issue in this case [hereinafter the "Plan"]. Ex. 3.[3] The Plan sets forth the terms and conditions of benefits for participating members. The earliest version of the Plan relevant herein was adopted in 1979. Ex. D-6.[4] The Plan was thereafter revised and restated in 1985, 1994, and 2002. Exs. D-7, -10, -27. At all times, the Plan has been overseen by a Board of Trustees, administered by a manager, and advised by a private actuarial firm. At present, the Plan administers benefits for over 400 participants and receives contributions from approximate fifty employers.

As of May 31, 1975 when Pickreign last worked as a union member, the Local 497 pension plan required that an individual have accumulated a minimum of twenty years of credited service to obtain entitlement to benefits. Ex. 1 at 6. However, the merger agreement between the pension plans of Locals 497 and 773 provided that the Plan "will pay pension benefits to former members of [Local 497] pursuant to its rules and regulations, giving credit to former members of [Local 497] for service in [Local 497] on the same basis as credit is given for service in [Local 773]." Ex. 3 at 2. However, ERISA became effective on January 1, 1975 and became applicable to the Plan for vesting requirements at the commencement of the Plan's year on June 1, 1976.[5] See 29 U.S.C. §§ 1031, 1061, 1114.

---

[3] Documents thereafter refer to the Plan as that of Local 773 without reference to Local 497.

[4] Ex. D-6 is a description of the Plan and not the written terms and conditions themselves. This version of the Plan itself was not offered in evidence during the trial.

[5] A "Plan Year" ran from June 1 to the following May 31. Ex. D-10 at § 1.13.

ERISA reduced the minimum vesting period to ten years. Id. at § 1053(a). Thus, one year following Pickreign's last day of employment as a union member, the minimum period for an employee to vest under the Plan became ten years.

Pickreign turned sixty-two on November 17, 1998 and began making inquiries to the Trustees about his eligibility for benefits. See, e.g., Ex. D-14. The most recent restatement of the Plan then in effect had been adopted in November 1994. Ex. D-10. It required ten years of credited service for members whose credited service terminated between June 1, 1976 and May 31, 1990. Id. at § 4.07(B). It required fifteen years of credited service for members whose credited service terminated between June 1, 1974 and May 31, 1976. Id. at § 4.05(B). For members whose credited service terminated before June 1, 1976, credited service was forfeited if the member had not vested at the time of the termination. Id. at § 4.02. When Pickreign terminated his union employment on May 31, 1975, Plan records credited him with 11.9 years of service. Exs. D-4, D-22; see also Ex. D-10 at § 5.02. Moreover, a member who wished to receive benefits after turning fifty-five and before age sixty-five was required to have accrued at least fifteen years of credited service. Id. at §§ 5.03, 5.04.

After a series of communications between Pickreign and the Trustees, the Plan manager advised Pickreign in a letter dated January 6, 2000 that Pickreign did not qualify for benefits because he had not accrued fifteen years of credited service before the termination of his union employment on May 31, 1975. Ex. D-16. By letter dated September 12, 2000, Pickreign submitted to the Trustees a formal application for benefits. Ex. D-18. In his application, Pickreign asserted that he was entitled to fifteen years of credited service

4

and that he was entitled to a monthly benefit of $1,012.50 from age sixty-two. Id.[6]

> The "Hour Bank" provision in the 1994 version of the Plan provided as follows:
>
> For use in determining Future Pension Service hereunder, and not Vesting Service,[7] if, in any one Plan Year after May 31, 1972, an Employee is credited with more than 1200 hours of Pension Service,[8] such hours in excess of 1200 shall not be credited to him for such Plan Year, but shall be credited to him in the earliest Plan Year, prior to or subsequent to the Plan Year, but shall be credited to him in the earliest Plan Year, prior to or subsequent to the Plan Year in which such excess is earned, but not to a Plan Year more than two Plan Years after the Plan Year in which such excess is earned nor more than one Plan Year prior to the Plan Year in which such excess is earned. The amount of such excess hours credited to an Employee in any such Plan Year shall be no more than that which is necessary to raise his earned hours for such Plan Year to 1200. Subject to the limit contained in the prior sentence, excess hours must be credited to the Employee as soon as possible after the Plan Year in which such excess hours were earned. No such crediting of excess hours can be made to a Plan Year in which the employee's Pension Date occurs. 1200 hours is revised to 1560 hours effective June 1, 1985 and effective June 1, 1990, there is no limit on the number of hours of Pension Service in any Plan Year.

Ex. D-10 at § 3.05. Pickreign contended that he worked at least forty hours per week and at least fifty weeks per year throughout his employment with Fobare & Sons, or at least 2,000 hours per year. The Hour Bank provision would arguably serve to allow Pickreign to apply

---

[6] When Pickreign determined to file a formal application, the Plan sent him an application form which already stated that Pickreign had accrued 11.0 years of credited service and a retirement date falling on his next birthday, his sixty-fourth. Ex. D-14. Pickreign crossed out both assertions, changing them by hand to fifteen years of credited service and his sixty-second birthday respectively. Id. For reasons unknown, the Trustees initially refused to consider the application because of the changes, thus delaying formal consideration of the application.

[7] "Vesting Service" is defined in the Plan generally as time accrued by a member up to the minimum time required to gain entitlement to benefits and includes Pension Service. Ex. D-10 at §§ 1.16, 4.07, 4.08.

[8] "Pension Service" is defined in the Plan generally as the amount of credited service accrued by a member. Ex. D-10 at §§ 1.10, 3.01-.03.

the 800 excess hours he worked each year beyond the 1,200 hour minimum to extend his break-in-service[9] beyond June 1, 1976 when the vesting requirement was reduced to ten years.

    The Plan manager rejected Pickreign's application.  He concluded from Plan records that at the time of Pickreign's break-in-service on May 31, 1975, Pickreign had accrued 11.9 years of credited service, the Hour Bank provision did not apply to Pickreign, and the 11.9 years of credited service fell short of the fifteen-year minimum required for vesting. Pickreign was advised of the denial in a letter dated October 19, 2000.  Ex. D-19.  The letter advised Pickreign of his right to appeal the denial to the Trustees and by letter dated October 25, 2000, Pickreign appealed.  Ex. D-20. The appeal was heard by the Trustees on December 6, 2000.  Ex. D-21.  As they advised Pickreign in a letter dated December 8, 2000, the Trustees "determined that your years of credited service vested and consequently you are eligible for a pension." Ex. D-22.[10]  The Trustees determined that Pickreign had accrued 11.9 credited years, not the fifteen he claimed, and was eligible to receive benefits

---

[9]The Plan defines a break-in-service as follows:

> If an Employee did not earn any Pension Service during a Plan Year (during which he was a participant in the Plan) before June 1, 1976, then he shall have incurred a Break in Service and all of the Employee's Pension Service and Vesting Service earned before the end of such Plan Year shall be forfeited unless the Break in Service occurred after he was vested.

Ex. D-10 at § 4.02.  The Plan defines "Break Year" as "a Plan Year after May 31, 1975 during which, while a participant in the Plan, the Employee does not earn at least 500 hours of Vesting Service nor at least 360 hours of Pension Service."  Id. at § 1.03.

[10]Neither the transcript of the hearing nor the resolution unanimously adopted by the Trustees determining Pickreign's appeal reveal the reasons for the Trustees' decision. See Ex. D-22.

6

effective February 1, 2001 in a monthly amount of $142.80, not the $1, 012.50 claimed by Pickreign.  Id. ; see also Ex. D-26.

Contending that he was entitled to a higher monthly benefit, Pickreign communicated with the Plan manager concerning the calculation of the benefit.  Ex. D-24.  In response, the Plan manager sought the opinion of the Plan's actuarial firm as to the proper amount.  Ex. D-25.  The actuarial firm advised that "[o]ur opinion is that Mr. Pickreign was not vested at the time of his separation from service and is not eligible for any benefit . . ." but that if a benefit was to be paid, it should not exceed the amount already awarded.  Ex. D-26.  The Plan manager adhered to the prior award and Pickreign filed a second formal appeal limited to the Trustees' determination of the amount of the monthly benefit.  Ex. D-30.  A hearing was held and by letter dated November 8, 2002, the Trustees rescinded their earlier award of benefits and denied Pickreign's application.  Ex. D-32.[11]  This action followed.

---

[11]The minutes of the Trustees' meeting conclude as follows:

> A discussion then ensued as to whether Mr. Pickreign was entitled to a pension at all in light of the letter from Actuary Steve Thomas.  Trustee Daniel Monroe, the Trustee who made the original motion to grant Mr. Pickreign a pension, indicated that that decision was made based upon the belief that the Actuary had reviewed all of the information pertaining to Mr. Pickreign prior to the December 6, 2000 appeal when in fact he had not.  In light of the letter from Mr. Thomas, Trustee Daniel Monroe made a motion to follow the advice of the professionals who indicate that Mr. Pickreign was not entitled to a benefit . . . and the motion was unanimously carried.

Ex. D-31 at 2.

## II. Discussion

### A. Exhaustion of Remedies

As a threshold matter, the Trustees contend that by failing to appeal from the final rescission and denial of benefits, Pickreign failed to exhaust his administrative remedies and his claims should be dismissed.

The Plan is a collectively bargained, defined benefits plan governed by ERISA. See Docket No. 1 at ¶ 6 & Ex. A. "ERISA requires both that employee benefit plans have reasonable claims procedures in place, and that plan participants avail themselves of these procedures before turning to litigation." Eastman Kodak Co. v. STWB, Inc., 452 F.3d 215, 219 (2d Cir. 2006); see also 29 C.F.R. § 2560.503-1 (outlining the requirements of employee benefit plans claim procedures including notification of adverse decisions and reasonable methods for appealing such determinations); Kennedy v. Empire Blue Cross & Blue Sheild, 989 F.2d 588, 594 (2d Cir. 1993) (recognizing "the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases" and explaining that "exhaustion . . . requires only those administrative appeals provided for in the relevant plan . . . .") (citations and quotation marks omitted); Hector v. Wal-Mart Group Health Plan, 100 F. Supp. 2d 135, 136 (N.D.N.Y. 2000).

> The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo.

Kennedy, 989 F.2d at 594 (citations omitted). However, the exhaustion provisions will not be enforced "[w]here claimants make a 'clear and positive' showing that pursuing . . . [such]

remedies would be futile, [since] the purposes behind the requirement . . . [would] no longer [be] served . . . ." Id. (citations omitted).

In this case, the Plan provided a reasonable appeal procedure. See Ex. D-10, Art. 15. In the event of a claim denial, a claimant was required to serve the Trustees with a written appeal within sixty days of receiving the denial. Id. at § 15.02. The Trustees would then hold a hearing at which the claimant could "present his views in writing and/or appear in person." Id. The Trustees would then provide a written decision to the claimant which was "binding and final." Id.

There is no doubt that Pickreign twice followed this appeal procedure. After a substantial exchange of correspondence and upon the denial of Pickreign's 2000 application, he filed a written appeal requesting a special hearing. Ex. D-20. The Trustees held a special meeting at which Pickreign represented himself. Exs. D-21, -22. The written decision of the Trustees stated that Pickreign was entitled to a pension. However, Pickreign disagreed with the amount awarded and again appealed to the Trustees. Exs. D-22, -24, -30. After the second special meeting at which Pickreign also appeared in person, the Trustees issued a written decision rescinding and denying Pickreign's pension benefits. Exs. D-31, -32. Pickreign then advised the Trustees that an administrative resolution appeared futile. Ex. D-33.

Pickreign has satisfied the exhaustion requirement for at least three reasons. First, he twice appealed to the Trustees and received two hearings and two decisions. Given the duration, nature, and results of the two appeals, the Trustees had a full and fair opportunity to consider and determine Pickreign's contentions. Second, it appears from the record that the Trustees in fact considered their decision on Pickreign's second appeal to be its final

decision not subject to any further administrative appeals. The written notice of that decision described the procedure as "your appeal of the previous appeal decision . . . ." Ex. D-32. Third, any argument that Pickreign should have filed a third appeal is belied by the rescission and denial of his pension benefits on his second appeal where the only issue raised by Pickreign was the amount of the benefits. This action by the Trustees constituted a clear and positive showing that any further administrative appeal was futile.

Accordingly, the Trustees' contention on this ground is rejected.

### B. Pickreign's Eligibility for Benefits

"ERISA abounds with the language and terminology of trust law" and, therefore, when considering issues presented by ERISA claims, trust principles provide guidance. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-12 (1989). "Consistent with established principles of trust law, . . . a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115. When a trustee is granted discretionary authority, a deferential standard of review is appropriate. Id. at 111 (citing Restatement (Second) of Trusts § 187 (1959)). The deferential standard to be used is the arbitrary and capricious standard. Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995); Kekis v. Blue Cross & Blue Shield of Utica-Watertown, Inc., 815 F. Supp. 571, 578 (N.D.N.Y. 1993) (citations omitted).

"Under the arbitrary and capricious standard of review, . . . a decision to deny benefits [may] only [be overturned by the court] if it was without reason, unsupported by

substantial evidence or erroneous as a matter of law." Pagan, 52 F.3d at 442. As the Second Circuit has stated, "discretionary acts of a pension committee should not be disturbed, absent a showing of bad faith or arbitrariness." Miles v. New York State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan, 698 F.2d 593, 599 (2d Cir. 1983); Amond v. Syracuse China Corp., No. 93-CV-91, 1993 WL 476490, at *3 (N.D.N.Y. Nov. 15, 1993). Bad faith and arbitrariness are demonstrated when "the trustees of a plan . . . interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provision of the plan superfluous . . . ." Miles, 698 F.2d at 599 (citations omitted). Additionally, because a trustee's "duties are dictated by the policy, . . . [a trustee] who ignores the terms of the policy and inserts its own terms [also] acts arbitrarily and capriciously." Kekis, 815 F. Supp at 579.

In this case, the language of the Plan explicitly granted the Trustees the authority to interpret and amend the Plan as well as to determine benefit eligibility and benefit amounts. Ex. D-10 at § 16.13. Thus, the Trustees were granted discretionary authority and, absent arbitrary or capricious conduct, their decision to deny Pickreign benefits requires deference. The first question presented is whether Pickreign vested with the Plan. As of his last day of work at Fobare & Sons on May 31, 1975, Pickreign had worked 11.9 years as a union member. The required vesting period at that time was fifteen years. Thus, unless Pickreign accrued additional credited service of at least 3.1 years or unless the date of his break-in-service fell after May 31, 1976 when the minimum vesting period became ten years, he failed to qualify for a pension. This determination depends on the applicability and provisions of the Hour Bank.

Pickreign initially was employed as a member of Local 497 and participated in its

11

pension plan. In 1974, Local 497 merged its pension plan with that of Local 773 with the Plan agreeing to pay benefits to former Local 497 members. Exs. D-1, -3 at 2. ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102. However, "employee benefit plan[s] under ERISA can be comprised of more than one document." Eardman v. Bethlehem Steel Corp. Employee Welfare Benefit Plans, 607 F. Supp. 196, 207 (W.D.N.Y. 1984). Thus, the Plan documents may be considered in conjunction with other documents.

The 1974 merger agreement stated that the Plan would provide Local 497 members with benefits that were substantially equivalent to or greater than those previously provided under Local 497's plan. Ex. D-3 at 1. Additionally, the merger agreement stated that any future pension benefits to be paid to former Local 497 members would be paid pursuant to the Plan's current rules and regulations. Id. at 2. Therefore, reading the Plan and the merger agreement together, the Plan, including the Hour Bank provisions, controlled the determination of credited service as of the date of the merger agreement.

As noted, Pickreign had accrued only 11.9 years of credited service as of his last day of employment on May 31, 1975. If a member had not vested prior to a break-in-service, the accrued time was forfeited as of that date. See Ex. D-10 at § 4.02.[12] As of June 1, 1976, the period required for vesting became ten years. Thus, Pickreign could only have

---

[12]This section provides as follows:

> If an Employee did not earn any Pension Service during a Plan Year (during which he was a participant in the Plan) before June 1, 1976, then he shall have incurred a Break in Service and all of the Employee's Pension Service and Vesting Service earned before the end of such Plan Year shall be forfeited unless the Break in Service occurred after he was vested.

vested if his break-in-service occurred after that date.  The Hour Bank provision afforded Pickreign the only possibility of extending his break-in-service date until after June 1, 1976.  If applicable, Pickreign could utilize the Hour Bank provision to extend his break-in service beyond June 1, 1976 and qualify for a pension.[13]

However, the Hour Bank provision specifically states in its first sentence that the Hour Bank may be utilized "in determining Future Pension Service hereunder <u>and not Vesting Service</u> . . . .".  Ex. D-10 at § 3.05 (emphasis added).  "Future Pension Service" is defined as credited service for time periods beyond the period in which the credited service is actually earned.  See id. at §§ 1.10, 3.02.  Thus, the Plan did not permit Pickreign to utilize the Hour Bank to extend his break-in-service beyond June 1, 1976.  Because it did not, his break-in-service under the Plan occurred on May 31, 1975, Pickreign had not vested in the Plan as of that date, and the Trustees reasonably concluded that Pickreign was not entitled to a pension under the Plan.

Alternatively, Pickreign contends that by working at least 2,000 hours per year for Fobare & Sons for twelve years from 1963 to 1975, he accumulated excess hours each year and the credit for those excess hours carried his credited service beyond the fifteen years required for vesting in 1975.  See, e.g., Ex. P-2.  This contention depends on whether the Plan or the earlier Local 497 pension plan permitted such accumulation.  The Trustees

---

[13] To avoid a break-in-service, the Plan required that a member receive credited service in each Plan Year of "at least 500 hours of Vesting Service [and] at least 360 hours of Pension Service."  Ex. D-10 at § 1.03.  Assuming without deciding that Pickreign worked at least 2,000 hours each year as he testified, Pickreign was entitled under this provision, for example, to apply the 800 excess hours from the 1973-74 Plan Year two years forward to the 1975-76 Plan Year and the 800 excess hours from the 1974-75 Plan Year two years forward to the 1976-77 Plan Year.  Thus, Pickreign's break-in-service date would be extended to May 31, 1977 and he would qualify for a pension.  See Ex. P-2.

13

contend that the Plan limited the amount of service a union member could accumulate in any given year and that with this limitation, Pickreign failed to accrue fifteen years of credited service by May 31, 1975.

The 1994 version of the Plan makes no mention of a limit on hours worked during that time period. See Ex.D-10 at §§ 3.02-.04; see also id. at § 3.05 (stating that as of May 31, 1972, no more than 1200 hours of future pension service may be credited in any one year). However, the subsequent Summary Plan Description dated June 1, 1997 sent to Plan participants stated that "[p]rior to June 1, 1985, there is a limit of one year of Pension Service that you can earn in any one Plan Year." Ex. D-11 at ¶ 20 (emphasis added).[14] As discussed supra, the terms and conditions of a plan may be set forth in multiple documents which may be read in conjunction if not inconsistent. Viewing both documents together, it is clear that the one-year limitation was always intended to apply to all service earned prior to 1985.

The Plan Summary states that "in the event that there appears to be a conflict between the . . . [Summary] and its statement in the Pension Plan itself, the language contained in the Pension Plan is . . . governing . . . . " However, the language in the two documents do not conflict. Rather, the Plan Summary adds a term, apparently inadvertently omitted from the Plan itself, which places a limitation on the amount of credited service which could be credited.  The absence of such language in the Plan itself does not create a conflict with the Plan Summary and the Trustees interpretation of the Plan and its Summary

---

[14]The Plan manager testified at trial that this sentence was inadvertently omitted from the 1985, 1994, and 2002 versions of the Plan but was included in each Plan Summary. See, e.g., Exs. D-6 at ¶ 21 (1979 version), D-11 at ¶ 20 (1994 version), D-28 at ¶ 20 (2002 version).

as limiting credit to one year is entitled to deference. Applying that limitation to Pickreign's record confirms that he had not accrued fifteen years of credited service prior to May 31, 1975.

Accordingly, Pickreign failed to vest in the Plan and the final decision of the Trustees to deny benefits to Pickreign was neither unreasonable, arbitrary, nor capricious and was supported by the evidence.

### III. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that judgment is granted to the Trustees in all respects.

**IT IS SO ORDERED.**

DATED: June 12, 2008
       Albany, New York

*David R. Homer*
United States Magistrate Judge